THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ANTONIO DE JESÚS CRUZ, k/a TOÑO, Defendant and Appellant.

No. CR-66-80.     Decided March 10, 1967.

*Domingo R. Emanuelli Rivera* and *Obdulio Bauzá* for appellant. *J. F. Rodríguez Rivera, Acting Solicitor General,* and *Héctor R. Orlandi Gómez, Assistant Solicitor General,* for The People.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Appellant was accused of the offense of rape consisting in that during March 1963 he had sexual relations with Elba Luz Lerdo Nieves who was not his wife, without her consent, against her wishes and by means of force and violence and under threat of grave bodily harm.

The evidence of The People introduced before a jury consisted of the testimony of the aggrieved girl Elba Luz Lerdo, of Catalina Estrada, grandmother and foster mother of the girl, of policeman Roberto Sanabria and of Dr. Gustavo Rivera Ayala.

According to that evidence, in March 1963, Elba Luz, then 14 years and six months old, lived in Lares at the home of her uncle. One of the days of that month of March she came to Río Piedras and stayed overnight at her aunt and foster sister's home, Julia Ramos, who lived with her husband, appellant herein, at Extensión San Agustín in Río Piedras. The girl slept in a room next to that occupied by her aunt and the defendant. Said girl testified that she was asleep when she felt somebody pulling her by the legs and saw defendant naked who asked her not to say anything because he was going to kill her and she was frightened but as she knew that defendant had a revolver in the house she did not scream; that defendant muzzled her with a sheet, undressed her, abused her and had sexual relations with her by force; that defendant was with her for about an hour, the sheet was stained with blood; that afterwards defendant left for his bedroom and she wept and did not dare to tell anybody because her aunt was pregnant. She testified also that the next day she got up, had breakfast, did what she had to and washed the sheet so that her aunt would not find out and suffer. After lunch she left with María, Segundo's wife for her grandmother's home, Catalina Estrada, who lives in the Carraízo ward of Trujillo Alto; that she did not say anything to her grandmother because defendant had threatened her with death. About a week afterwards, in the month

of April, she stayed again at her aunt Julia's home because the latter sent for her because she was about to give birth. On the night of the day she arrived she went to sleep in the same bedroom next to that of defendant and his wife. Defendant went again to her room in his undershorts, went to bed with her, remained longer than the first time and did that twice without resting. She did not say anything of what had happened either. About two days afterwards she went to sleep about ten o'clock at night and was not expecting defendant because two days had gone by and he had not been to visit her. That night she was awake when defendant came in wearing his undershorts; she got up and left with the idea of going to Julia's bedroom but did not get there and returned believing that defendant was in the bathroom where he had gone; that he returned and went to bed with her and were together longer than the first and the second time; that defendant did that several times that night; that defendant rested between sessions; that both were naked; that the last time he did it she went out of the bedroom, ran into Julia and told the latter that she was hot, that she was going to take a shower, which she took; that that happened rather late, between half-past twelve and one in the morning. Lastly she testified that the next day she sent word to her grandmother to come for her because she could no longer stand defendant's abuses, and the grandmother complied. Next day she told her grandmother what had happened because she was frightened. She did not become pregnant. She testified before the prosecuting attorney in November 1963.

Catalina Estrada, grandmother of the aggrieved girl testified that her granddaughter, while at Julia's home, told her in April what had happened to her with appellant.[1] With strong opposition from the defense she testified: "Elba Luz

---

[1] On cross-examination she testified, however, that it was at the witness' home in Carraízo and not at Julia's where her granddaughter told her what happened to her with appellant.

told me that in the month of March when she was at the home of my daughter Julia, who is her sister and aunt, well she told me that she had been to visit her and it became late and she stayed overnight; that de Jesús went to her bed that night, that she resisted him, that he offered her many things and so forth and that he was going to teach her how to drive, that he was going to give her money and threatened her and so forth and then by force, because he overpowered her; but since he is a very . . . man; that he is very strong, well he overpowered her, got into bed with her and then, as he threatened her she did not dare to say anything to me or to any member of the family, she did not say a thing. . . . Yes, she told me that he had dishonored her, she told me in April, that the first time was in March, but because of the threats she did not dare say a thing."

This lady testified also that she sent for defendant and that the latter arrived at her home, went in, went to where Elba Luz was doing the dishes and slapped her and denied having done it; that about a week afterwards she took the girl to a physician to have her examined and that it was not until the month of November that she reported the facts to the prosecuting attorney because she was waiting for her daughter Julia to have her child. Policeman Roberto Sanabria testified that he conducted an investigation of this case and seized a revolver at the home of the defendant which was delivered to him by defendant's wife and said revolver appears registered in appellant's name.

Dr. Gustavo Rivera Ayala testified that on October 28, 1963 he examined minor Elba Luz Lerdo and found that said girl had lost her virginity some time ago, that defloration was not recent.

The only evidence for the defense was the testimony of Julia Ramos, defendant's wife. She said in synthesis that it was in January that her niece Elba Luz came from Lares with the witness' brother and his wife and that the three slept

at her home in a room next to hers; that the doors of the bedrooms in her house have a latticework on the upper part and that the day Elba Luz slept at her house she did not hear any noise that attracted her attention; that Elba Luz never complained of anybody having molested her; that in March Elba Luz stayed at her home about three weeks or thirteen or fifteen days and that it was in January that she stayed one night at her home; that the witness' mother never went to her home to get Elba Luz; that she had a conversation with her mother regarding a stain the mattress had but that it was not a bloodstain; that defendant has been a model husband to her, that he has never been convicted for any offense and that he once hit her because she made a mistake in a payroll.

Appellant assigns the commission of nine errors. In the first two he maintains (1) that the testimony of Catalina Estrada González regarding the complaint her granddaughter Elba Luz made, is hearsay evidence which is not part of the *res gestae* and, therefore, inadmissible in evidence, and (2) that the evidence is insufficient to sustain the verdict of guilt.

■■ In a prosecution for the offense of rape defendant cannot be convicted on the sole testimony of the prosecutrix unless such statement is corroborated with some other evidence which in itself, and without taking into consideration the testimony of the prosecutrix, tends to connect the defendant with the commission of the crime. Rule 154 of the Rules of Criminal Procedure. The only evidence introduced in the case at bar to corroborate the testimony of the prosecutrix was her grandmother's testimony about the complaint the former made to her. Proof of the complaint is admitted in evidence when it forms part of the *res gestae*. In the case of *People* v. *Calventy*, 34 P.R.R. 375 (1925), we already defined the true purpose and the principle of the *res gestae*

doctrine. To that effect in that case we copied from Professor Wigmore the following:

" 'This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as express-ing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts. The ordinary situation presenting these condi-tions is an affray or a railroad accident. But the principle itself is a broad one,' 3 Wigmore, sec. 1747, p. 738.

" 'The utterance must have been *before there has been time to contrive and misrepresent, i.e.,* while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance. This limitation is in practice the subject of most of the rulings.

" 'It is to be observed that the statements *need not be strictly contemporaneous* with the exciting cause; they may be subse-quent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. The fallacy, formerly entertained by a few courts, that the utterance must be strictly contemporaneous (*post,* sec. 1756), owes its origin to a mistaken application of the Verbal Act doctrine. . . .

" 'Furthermore, there can be *no definite and fixed limit* of time. Each case must depend upon its own circumstances. . . .

" 'Since the application of the principle thus depends entirely on the circumstances of each case, it is therefore impossible to regard rulings upon this limitation as having in strictness the force of precedents. To argue from one case to another on this question of "time to devise or contrive" is to trifle with principle and to cumber the records with unnecessary and unprofitable quibbles. There is a lamentable waste of time by Supreme Courts

in here attempting either to create or to respect precedents. Instead of struggling weakly for the impossible, they should decisively insist that every case be treated upon its own circumstances. They should, if they are able, lift themselves sensibly to the even greater height of leaving the application of the principle absolutely to the determination of the trial court. Until such a beneficent result is reached, the lucubrations of Supreme Courts over the details of each case will continue to multiply the tedious reading of the profession.' Id.—section 1750, pp. 744–751." (34 P.R.R. 376–377.)

We also said in the case of Calventy, *supra*, "that unless and until an appellant can show an open disregard or plain departure from the principle involved, we shall not be disposed to interfere with the exercise of a sound discretion by the trial judge." (Pp. 377–378.)

█ In a series of decisions we have held that the time elapsed between the occurrence of the facts and the utterances which are considered part of the *res gestae* is not the governing factor to determine the applicability of the doctrine. In *People* v. *Arenas*, 39 P.R.R. 14 (1929), the statements of the injured woman made to her mother when she first sees her four days after the defendant had kept her at another person's house, were considered as part of the *res gestae* and it was said: "It is not a question of time. That utterance was the first spontaneous and perhaps irresistible exclamation, without premeditation and without any other deliberate purpose than to inform her mother of her disgrace, as if it had occurred five minutes before."

█ In *People* v. *Blanco*, 40 P.R.R. 122 (1929), the time elapsed prior to the statements considered as part of the *res gestae* was a year, but during all that time the offended girl was under the physical control of defendant under threats of physical violence unable to communicate with her relatives. When she first saw her sister she told her what happened with defendant. In many other decisions, among them, that of *People* v. *Fuentes*, 63 P.R.R. 42 (1944);

*People* v. *Muñoz,* 68 P.R.R. 159 (1948) ; *People* v. *López,* 76 P.R.R. 354 (1954) ; *People* v. *Vázquez,* 77 P.R.R. 885 (1955), the statements of the prosecutrix admitted in evidence as part of the *res gestae* were not contemporaneous with the facts which motivated them but the doctrine was applied on the ground of the spontaneous nature of the utterances, taking into consideration the circumstances which prevented prosecutrix from complaining contemporaneously with the commission by defendant of the wrongful acts. As Professor Wigmore stated, the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Probably echoing Professor Wigmore's thought and the case law in this case, some text writer has commented that in the *res gestae* it is the facts which talk through the parties, and not the parties which talk about the facts. As in order to apply the doctrine the trier should abide by the particular circumstances in each case, it seems to us that in the one under consideration now there has been a deviation of the principle involved. From the evidence as a whole which we have already outlined it becomes a little difficult, because it is improbable, to believe that the offended woman was prevented, under fear of defendant's threats, from complaining to her grandmother or to another person on a date contemporaneous with the occurrence, thus it being improbable that the complaint admitted in evidence was spontaneous and as a result admissible in evidence. The facts recited by the prosecutrix herself give way to doubt whether actually defendant had sexual intercourse with her by means of force and violence and under threats of receiving bodily harm. Notice that the prosecutrix testified having based her fear on the fact that defendant kept a revolver at home. On none of the occasions when she had sexual relations with defendant the latter made use of that revolver to threaten her. The place where they had those relations, the time defendant spent with the

prosecutrix on her bed, the conditions in which she performed the sexual acts, besides the impression left by the evidence regarding the promises defendant made to her, of giving her money and teaching her how to drive motor vehicles and prosecutrix's fear that her pregnant aunt would find out about the sexual relations she had with the former's husband, are some of the circumstances which make suspicious the credibility of the prosecutrix's testimony concerning the elements of force, violence, and threats required for the commission of the offense of rape. These are circumstances to be considered to determine whether the complaint of the prosecutrix to her grandmother actually forms part of the *res gestae*.

Her silence the day after her first sexual experience with defendant, when she travels in an automobile accompanied by Segundo and his wife María from Extensión San Agustín in Río Piedras to her grandmother's home in the Carraízo ward of Trujillo Alto, already out of defendant's reach; the lapse of a full week at her grandmother's place, free from defendant's presence who did not go to the Carraízo ward during that week; her acceptance to go back to defendant's home after that week, to stay there for the purpose of helping her sister, without the slightest protest; her willingness to remain hours and hours in bed with defendant, both naked, to perform several carnal acts with the corresponding rest between acts, truly divest of spontaneity the complaint that the prosecutrix makes to her grandmother several days after the occurrence.

On the other hand, the evidence gives us the impression that the prosecutrix kept silent in part, not for fear of defendant's threats but rather because her aunt was pregnant, that is, for different considerations, calculated not to inflict a supposed harm to her aunt. It should also weigh on the trier's conscience, as we said before, the circumstances surrounding the promises made by defendant to the prosecutrix

and his probable noncompliance as factor which made her decide to complain to her grandmother about what had happened.

■ The testimony of the grandmother of the prosecutrix regarding the complaint being inadmissible, because it is not part of the *res gestae*, there is no other evidence of corroboration in the record, and therefore, the verdict of conviction can not prevail.

The judgment appealed from will be reversed and another entered acquitting defendant.

Mr. Chief Justice Negrón Fernández did not participate herein.